**SO ORDERED.**

**SIGNED this 2 day of July, 2013.**

_J. Rich Leonard_
_____

**J. Rich Leonard**
**United States Bankruptcy Judge**

---

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

IN RE:

**BARRETT OAKES WELCH,**

    **DEBTOR.**

**CASE NO. 12–05082–8–JRL**
**CHAPTER 11**

---

**OLD REPUBLIC NATIONAL TITLE**
**INSURANCE COMPANY,**

    **PLAINTIFF,**

    **v.**

**BARRETT OAKES WELCH,**

    **DEFENDANT.**

**ADVERSARY PROCEEDING NO.**
**12–00253–8–JRL**

## <u>ORDER</u>

This matter came before the court on Barrett Oakes Welch's ("defendant") motion to dismiss

the complaint filed by Old Republic National Title Insurance Company ("plaintiff") in the

above–captioned adversary proceeding on the grounds that it fails to state a claim upon which relief

1

may be granted pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b)(6).  A hearing

was held in Raleigh, North Carolina on May 23, 2013.  At the conclusion of the hearing, the court

took the matter under advisement.

## BACKGROUND[1]

The defendant, a veterinarian in Dare County, North Carolina,  and Renee J. Welch

("Renee") were married from February 25, 1984 until their separation on February 15, 2005.  During

the course of the marriage, they acquired several parcels of real property, including a rental house

in Manteo, North Carolina, which is more particularly described as Lot 12 in the Evansville

Subdivision, as reflected on Map Book 1 at Page 145 of the Dare County Register of Deeds ("real

property").  Because it was acquired during their marriage, title to the real property was held by the

defendant and Renee as tenants by the entirety.

In 2006 and following their separation, the defendant made a series of investments, totaling

approximately $1.9 million, in a fraudulent real estate investment scheme along the North Carolina

coast known as Blue Water Land Development Co., LLC ("Blue Water").[2]  Loren Hamlin

("Hamlin") and William Ashley Gurganus ("Gurganus"), officers with the Kitty Hawk branch of

Bank of America, N.A. ("Bank of America"), executed an agreement with the principal of Blue

Water whereby  the defendant and other Blue Water investors would deposit their investment with

---

[1]The foregoing recitation of the facts forming the crux of this adversary proceeding are a
fair distillation of the allegations in the complaint, which are viewed in a light most favorable to
the non–moving party, the plaintiff. See Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th
Cir. 1993).

[2]Prior to the petition date, the defendant received a disbursement of $1,600,000.00 from a
mediated settlement agreement in the chapter 11 bankruptcy case filed by Blue Water in the
United States Bankruptcy Court for Eastern District of North Carolina, Case No.
08–00842–8–JRL.

Bank of America in exchange for certificates of deposit.  These funds, which were on deposit with Bank of America, were then funneled to coastal real estate developments in northeastern North Carolina.

To finance his investment in Blue Water and with the assistance of Hamlin and Gurganus, the defendant procured capital from various sources, including family members and loans from various lenders, which were secured by deeds of trust on parcels of real property owned by the defendant and Renee.  On April 25, 2006, the defendant executed an equity line of credit in favor of Equity Services, Inc. ("Equity Services") in the original principal amount of $150,000.00, which was secured by a deed of trust on the real property and recorded in Book 1683 at Page 62 of the Dare County Register of Deeds ("deed of trust").[3]  Although a signature purportedly belonging to Renee appeared on the deed of trust, she never executed the deed of trust encumbering the real property.

The loan closing took place at the office of local attorney Dan Merrell of Dan L. Merrell & Associates, P.C. ("Merrell"), who represented both the defendant and Equity Services.  After he executed the deed of trust and at Hamlin's request, the defendant removed the deed of trust and other items from the loan closing file and took them to the Kitty Hawk branch of Bank of America for Hamlin's review.  Without her knowledge, consent, approval or permission, the defendant and Hamlin forged Renee's signature on the deed of trust.  Thereafter, Hamlin directed an employee of Bank of America to acknowledge the defendant's signature and Renee's forged signature.  The defendant, who was familiar with the financing and acquisition of real property, knew that the procurement of title insurance was required in connection with the transaction.  At his own expense,

---

[3]The proceeds of the loan, $150,000.00, formed a small portion of the defendant's $1.9 million investment in Blue Water.

the defendant purchased and the plaintiff issued a title insurance policy naming Equity Services as the insured.

Following their separation, the loan closing and recordation of the deed of trust at issue, the defendant commenced an equitable distribution action against Renee in the Dare County District Court, File No. 07–CVD–862. During the course of the proceeding, Renee discovered several deeds of trust on record with the Dare County Register of Deeds bearing her forged signature and commenced third–party actions against the various lenders and trustees under the deeds of trust seeking a determination of their validity. On November 2, 2010, in a third–party action regarding the validity of the deed of trust at issue, the Dare County District Court declared that Renee's signature had been forged.

Thereafter, a claim was made on the title insurance policy by Equity Services. Consistent with its obligations thereunder, the plaintiff retained Trimpi & Nash, LLP to defend against the claim arising from the forged deed of trust and incurred approximately $38,000.00 in legal fees and costs. On July 3, 2012, and in exchange for the payment of $30,000.00, Renee executed a quitclaim deed of trust on the real property, which was recorded in Book 1902 at Page 141 of the Dare County Register of Deeds. Thus, the plaintiff expended $30,000.00 in ratifying the forged deed of trust and incurred approximately $38,000.00 in attorney's fees and costs in defending the claim filed against the policy.

On July 12, 2012, the defendant filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The plaintiff timely filed the multi–count complaint initiating this adversary proceeding on October 4, 2012, asserting eight claims for relief against the defendant for (1) forgery; (2) fraud; (3) facilitation of fraud; (4) conspiracy to commit fraud; (5) violations of the North

4

Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75–1.1 et seq. (hereinafter "UDTPA"); (6) punitive damages; (7) nondischargeability pursuant to § 523(a)(2); and (8) nondischargeability pursuant to § 523(a)(6).  The first claim for relief alleges that the defendant forged Renee's signature on the deed of trust, which he utilized to obtain financing from Equity Services and the title insurance policy issued by the plaintiff.  The plaintiff's second claim for relief asserts that its justifiable reliance on and the defendant's misrepresentations and forgery of Renee's signature on the deed of trust amount to fraud, which caused the plaintiff to issue the title insurance policy and suffer damages of approximately $68,000.00.  The third and fourth claims for relief, alleging facilitation of fraud and conspiracy to commit forgery, seek damages arising from the scheme alleged perpetrated by Hamlin and the defendant to acknowledge the forged signature on the deed of trust.  The fifth claim for relief states that the recordation of the forged deed to procure the title insurance policy issued by the plaintiff constitutes an unfair and deceptive trade practice in violation of the UDTPA.  The plaintiff's sixth claim for relief seeks recovery of punitive damages to remedy the defendant's fraudulent and willful or wanton conduct.  The seventh and eighth claims for relief seek a determination that the debt owed to the plaintiff be declared nondischargeable pursuant to § 523(a)(2) and § 523(a)(6) of the Bankruptcy Code.[4]

On December 5, 2012, the defendant filed his answer to the complaint, which included the motion to dismiss currently before the court.  The defendant's motion to dismiss and supporting memorandum assert that the complaint must be dismissed in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012 because each of the claims for relief therein are personal tort

---

[4]Unless otherwise indicated, all sections referenced herein are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

actions that do not afford the plaintiff, as a third party, any right to recovery.

## DISCUSSION

The defendant, relying on <u>Investors Title Insurance Co. v. Herzig</u>, 330 N.C. 681, 413 S.E.2d 268 (1992), contends that the claims presented by the plaintiff in its complaint are "personal in nature" and are specifically enumerated claims to which the plaintiff cannot recover because it was not a party to the loan transaction between the defendant and Equity Services.  Alternatively, the defendant argues that the plaintiff has failed provide allegations that plausibly demonstrate a claim for relief under the UDTPA because his alleged actions and conduct were not "in or affecting commerce."  Based on the lack of standing under <u>Investors Title</u> and absent any statutory authority, the plaintiff's claims for attorney's fees under the UDTPA and punitive damages must also be dismissed.  To the extent that <u>Investors Title</u> and supporting case law preclude the plaintiff from asserting any right to recovery under the first five claims for relief, there is no debt owed by the defendant from which § 523(a)(2) and § 523(a)(6) may except from discharge.

## I. Standard of Review

Pursuant to Fed. R. Civ. P. 8(a), made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7008, every pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2); Fed. R. Bankr. P. 7008.  To demonstrate entitlement to relief and survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6),  the complaint must include "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  Plausibility requires a plaintiff to "plead[] factual content that allow[s] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 667–78 (2009) ("The plausibility standard is not akin to

a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief." (internal citations, quotation marks and alterations omitted)).  A pleading must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  The veracity of the complaint's well–pleaded allegations will be presumed in determining "whether they plausibly give rise to an entitlement to relief." Angell v. BER Care, Inc. (In re Caremerica, Inc.), 409 B.R. 737, 747 (Bankr. E.D.N.C. 2009) (citation omitted).  Although "the facts [are construed] in the light most favorable to the plaintiff," the court "need not accept the legal conclusions drawn from the facts . . . [or] unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citation omitted).  The purpose of a motion to dismiss is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

## II.  Standing

Rule 17 of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7017, provides that "[an] action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a); Fed. R. Bankr. P. 7017; accord N.C. Gen. Stat. §1–57 ("Every action must be prosecuted in the name of the real party in interest, except as otherwise provided . . . .").  A "real party in interest" is one "who is benefitted [sic] or injured by the judgment in the case and who by substantive law has the legal right to enforce the claim in question." Carolina

7

First Nat'l Bank v. Douglas Gallery of Homes, Ltd., 68 N.C. App. 246, 249, 314 S.E.2d 801, 803 (1984) (quoting Reliance Ins. Co. v. Walker, 33 N.C. App. 15, 18–19, 234 S.E.2d 206, 209 (1977)); Winn v. Amerititle, Inc., 731 F. Supp. 2d 1093, 1099 (D. Idaho 2010) ("Modern interpretations of Rule 17(a) allow a real party in interest the ability to assign her rights in an action to a third party. The assignment can give the assignee proper standing as the real party in interest . . . .'" (citations omitted)).  "A lack of standing may be challenged by a 12(b)(6) motion to dismiss." See, e.g., Energy Investors Fund v. Metric Constructors, Inc., 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000).

As a general rule, North Carolina allows causes of action to be assigned to third parties, Morton v. Thornton, 259 N.C. 697, 699, 131 S.E.2d 378, 380 (1963) (recognizing that an assignee "is a real party in interest and may maintain the action."); however, "assignments of personal tort claims are void as against public policy because they promote champerty . . . ." Horton v. New S. Ins. Co., 122 N.C. App. 265, 268, 468 S.E.2d 856, 858 (1996); see Ivey v. First–Citizens Bank (In re Whitley), Adv. No. 12–02028, 2013 WL 486782, at *3 (Bankr. M.D.N.C. Feb. 7, 2013) (stating that "the North Carolina prohibition against the assignability of personal tort claims is grounded more generally in the importance of deterring champerty." (citations omitted)).  Personal tort claims, assignment of which is prohibited by the public policy of North Carolina,  include fraud, conspiracy to commit fraud, defamation, abuse of process, malicious prosecution, bad faith refusal to settle an insurance claim, breach of fiduciary duty, tortious breach of contract, and unfair and deceptive trade practices.  See, e.g., Investors Title, 330 N.C. at 688, 413 S.E.2d at 271 (holding that claims for conspiracy to commit fraud and unfair and deceptive trade practices violations, both of which are causes of action that are personal in nature, cannot be assigned); S. Ry. Co. v. O'Boyle Tank Lines, 70 N.C. App. 1, 8, 318 S.E.2d 872, 877 (1984) (stating that the purported assignment of individual

plaintiffs' personal injury claims to their employer, a co–plaintiff, "was contrary to public policy and ineffective . . . ."); <u>BSN Med., Inc. v. Parker Med. Assocs. LLC</u>, No. 3:09–CV–15, 2011 WL 5509030, at *21 (W.D.N.C. Nov. 17, 2011) (holding that a plaintiff lacked standing to assert a fraud claim where all the allegedly fraudulent statements were made to the plaintiff's predecessor–in–interest).

In <u>Investors Title</u>, the North Carolina Supreme Court held that claims for conspiracy to commit fraud and those alleging unfair and deceptive trade practices, arising out of an attorney's fraudulent certification of a title insurance application, were not assignable to the title insurance company. <u>Id.</u> at 688, 413 S.E.2d at 271 (stating that "while, in general, causes of action may be assigned, . . . unfair practice claims pursuant to N.C.G.S. 75–1.1 cannot be assigned." (citations omitted)). The plaintiff in <u>Investors Title</u>, a title insurance company, commenced a civil action against several defendants seeking damages for an attorney's execution of a fraudulent certification of title in connection with an false application for title insurance that stated there were no violations of restrictive covenants and deed restrictions placed on the property. <u>Id.</u> at 687, 413 S.E.2d at 270. The plaintiff issued a title insurance policy in reliance on the attorney's fraudulent certification of title. <u>Id.</u> at 687, 413 S.E.2d at 271. Before the commencement of the civil action and after a claim was filed on the title insurance policy, the insured assigned all of its rights arising out of the claim to the plaintiff in exchange for $34,364.38. <u>Id.</u> In reaching its conclusion, the court observed the legislative intent surrounding the enactment of the UDTPA "was to establish an effective cause of action for aggrieved consumers and to provide a method to maintain ethical standards of dealings between persons engaged in business and promote good faith thereby achieving the ultimate goal of protecting the consuming public." <u>Id.</u> at 689, 413 S.E.2d at 271–72 (stating that "assignability of

9

this claim [for unfair and deceptive trade practices] would be offensive to both legislative objectives." (citations omitted)).    The court also recognized that the plaintiff, under the circumstances, "is not an aggrieved 'consumer' because it is not a 'consumer' with respect to [the] defendants." Id. at 689, 413 S.E.2d at 272 (stating that the plaintiff "is the 'seller' of title insurance which was purchased . . . to protect the Bank.").

> If a claim for violation of the [UDTPA] is assignable, insurance companies and other powerful parties could buy these potentially profitable causes of action and ultimately profit from another's injuries, further negating the statutory intent of protecting the consumer.  The assignment of an unfair practice claim would wreak havoc by creating a market for claims of a personal nature.

Id. ("Common law subrogation is available to an insurer to recover any monies paid, while the aggrieved party can maintain an action for fraud or unfair practices.  In this way, the injured party, not the insurer, will receive trebled damages as contemplated by the Act.  Nonassignability ensures that all the parties are properly protected and the purposes of the law are upheld.").

In relevant part, the plaintiff's complaint alleges that the defendant intentionally deceived and misrepresented the validity of the deed of trust, which he knew bore the forged signature of Renee.  Notwithstanding this knowledge, the defendant submitted the forged deed of trust for recordation with the Dare County Register of Deeds, which was then used to procure the title insurance policy issued by the plaintiff.  The plaintiff justifiably relied upon these fraudulent representations in issuing a title insurance policy to Equity Services, which the defendant knew was necessary to consummate the transaction and acquire the capital for his investment in Blue Water.  Alternatively, the complaint alleges that the defendant facilitated this fraud and was engaged in a conspiracy to commit forgery by agreeing, along with Hamlin, that Renee's signature would be placed on the deed of trust without her knowledge or consent.  In furtherance this agreement, a Bank of America

employee was directed to acknowledge Renee's forged signature because both the defendant and Hamlin knew that the deed of trust, absent Renee's signature and proper acknowledgment by a notary public, could not be submitted for recordation.

To distinguish <u>Investors Title</u> and support the plausibility of its claims for forgery, fraud, facilitation of fraud, conspiracy to commit forgery and violation of the UDTPA, the plaintiff relies on <u>Lawyers Title Insurance Co. v. Chesson</u>, Adv. No. 09–09064, 2012 WL 4794148 (Bankr. M.D.N.C. Oct. 15, 2012).  In <u>Chesson</u>, Lawyers Title Insurance Company ("Lawyers Title") commenced an adversary proceeding seeking a determination that a debt, which consisting of damages it sustained under a title insurance policy that was issued in reliance upon a fraudulent affidavit executed by the defendant, was nondischargable pursuant to §523(a)(2) and § 523(a)(6). <u>Id.</u> at *1.  The defendant, a commercial mortgage loan officer, executed affidavits falsely attesting that two parcels of real property were not subject to any liens or other encumbrances arising from recent construction projects. <u>Id.</u> at *1–2.  These affidavits were submitted to and relied upon by Lawyers Title for the purpose of issuing two title insurance policies on the parcels. <u>Id.</u> at *2, 4. After a trial of the adversary proceeding, the court found that the defendant was liable for violating the UDTPA because these false affidavits had the tendency to and, in fact, did deceive and mislead Lawyers Title into issuing the two title insurance policies.  <u>Id.</u> at *6.  The court held that "[t]he execution and submission of the Affidavits in order to secure title insurance in connection with obtaining a business loan clearly involved a business activity which satisfies the second requirement under the UDTPA." <u>Id.</u>  Moreover, the loss sustained by Lawyers Title in connection with a state court settlement of claims filed against the title insurance policies, were "the natural and probable result of [the defendant] having executed the false Affidavits." <u>Id.</u>

11

The facts of the instant case are distinguishable from Investors Title because the plaintiff does not assert claims for relief as an assignee nor does it assert any right to relief belonging to or derived from the insured under the title insurance policy, Equity Services. "An assignment is substantially a transfer, actual or constructive, with the clear intent at the time to part with all interest in the thing transferred and with [] full knowledge of the rights so transferred." Ormond v. Conn. Mutual Life Ins. Co., 145 N.C. 140, 140, 58 S.E. 997, 997 (1907) (citations omitted); accord Morton v. Thorton, 259 N.C. 697, 700, 131 S.E.2d 378, 380 (1963) ("Since an assignment is a conveyance, it requires an assignor, an assignee, and a thing assigned."). By falsely representing the validity of the deed of trust and inducing the plaintiff to provide title insurance, the defendant subjected the plaintiff to claims that it would not have otherwise insured against had it known Renee's signature on the deed of trust was forged. Renee's forged signature, of which the defendant was aware at the time the title insurance policy was issued, caused the plaintiff to incur damages of $68,000.00 in legal fees and costs associated with rectifying the forgery. Because the plaintiff is not asserting the rights of Equity Services under the title insurance policy, as an assignee or otherwise, the instant case does not run afoul of Investors Title , promote champerty or wreak havoc on the statutory intent of the UDTPA. See id. at 689, 413 S.E.2d at 272; Chesson, 2013 WL 2012 WL 4794148, at *6. Accordingly, the plaintiff is the real party in interest and may allege its first, second, third, fourth and fifth claims for relief, all of which are  personal in nature.[5]

_____

[5]The remaining bases and arguments offered by the defendant in support of his motion to dismiss, all of which are premised on Investors Title precluding the plaintiff from asserting these claims for relief, are without merit and will not be addressed. Therefore, the sixth (recovery of punitive damages), seventh (dischargeability pursuant to 523(a)(2)) and eighth (dischargeability pursuant to 523(a)(6)) causes of action are supported by sufficient facts to give rise to the plausible belief that the defendant is liable.

To establish a violation of N.C. Gen. Stat. § 75–1.1 and state a claim for unfair or deceptive trade practices, a party must demonstrate: "(1) an unfair or deceptive act or practice by the defendant, (2) in or affecting commerce, (3) which proximately caused actual injury to plaintiff." White v. Thompson, 196 N.C. App. 568, 572, 676 S.E.2d 104, 108 (2009) (quoting Wilson v. Blue Ridge Elec. Membership Corp., 157 N.C. App. 355, 357, 578 S.E.2d 692, 694 (2003)). N.C. Gen. Stat. § 75–1.1(b) defines "commerce" as follows: "'Commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75–1.1(b). North Carolina courts "have construed the term 'commerce' broadly, encompassing more than mere business activity between sellers and buyers." White, 196 N.C. App. at 572, 676 S.E.2d at 108 (citing Harrington Mfg., Inc. v. Powell Mfg., Inc., 38 N.C. App. 393, 396, 248 S.E.2d 739, 742 (1978) ("G.S. 75–1.1(b) speaks in terms of declaring and providing civil means of maintaining ethical standards of dealings 'between persons engaged in business,' as well as between such persons and the consuming public.")); Durling v. King, 146 N.C. App. 483, 488–89, 554 S.E.2d 1, 4 (2001) ("The proper inquiry 'is not whether a contractual relationship existed between the parties, but rather whether the defendants' allegedly deceptive acts affected commerce." (emphasis in original)). Additionally, the applicability of the UDTPA is not limited to cases only involving consumers. United Labs., Inc. v. Kuykendall, 322 N.C. 643, 665, 370 S.E.2d 375, 389 (1988); accord Olivetti v. Ames Bus. Sys., Inc., 319 N.C. 534, 356 S.E.2d 578 (1987).[6]

---

[6]On several occasions, North Carolina courts have observed that "[t]he business of buying, developing and selling real estate is an activity 'in or affecting commerce' for purposes of G.S. § 75–1.1." Governor's Club, Inc. v. Governors Club Ltd. P'ship, 152 N.C. App. 240, 250, 567 S.E.2d 781, 788 (2002) (citations omitted), aff'd per curium, 357 N.C. 46, 577 S.E.2d 620 (2003); accord Carcano v. JBSS, LLC, 200 N.C. App. 162, 173–75, 684 S.E.2d 41, 50–51

Although different from typical UDTPA claims, the court finds that the allegations advanced by the plaintiff are analogous to those in <u>Chesson</u> and sufficient to plausibly demonstrate that the defendant's actions, which consisted of misrepresenting the validity of the forged deed of trust in order to procure title insurance, involved a business activity constituting "in or affecting commerce" under N.C. Gen. Stat. § 75–1.1(b).  <u>See</u> <u>Chesson</u>, 2012 WL 4794148, at *6.  Furthermore and because "commerce" is defined broadly to include "all business activities, however denominated," it is plausible that the defendant's procurement of title insurance on a parcel of real property by forging Renee's signature on a deed of trust had an impact on the marketplace and the consuming public.  <u>See</u> <u>id.</u>; <u>Durling</u>, 146 N.C. App. at 488–89, 554 S.E.2d at 4.  The court can draw the reasonable inference from these allegations that the plaintiff's reliance upon the forged deed of trust and the defendant's false representations was justified under the circumstances and caused it to incur approximately $68,000.00 in damages and legal costs.  After reviewing the record and the allegations levied against the defendant, the court concludes that the plaintiff has plausibly shown that the defendant's alleged actions and conduct amounted to the fraud–based claims alleged in the first four counts of the complaint and an unfair and deceptive trade practice.

---

(2009); <u>Wilder v. Squires</u>, 68 N.C. App. 310, 314–15, 315 S.E.2d 63, 66 (1984) (finding that a vendor actively engaged in the real estate business committed an unfair and deceptive trade practice by threatening a purchaser with the loss of his full binder if he did not accept the financing offered by the vendor); <u>see</u> <u>Stephenson v. Warren</u>, 136 N.C. App. 768, 525 S.E.2d 809 (holding that a private sale of a residence was not an act "in or affecting commerce" for purposes of N.C. Gen. Stat. § 75–1.1 because the seller was not involved in the business of selling real estate).  In a recent decision, the North Carolina Court of Appeals held that an activity involved in the *underlying transactions* accompanying the purchase, development and sale of real property is sufficient to support a finding that it was "in or affecting commerce" pursuant to N.C. Gen. Stat. 75–1.1. <u>Trantham v. Michael L. Martin, Inc.</u>, No. COA12–1160, slip op., 2013 WL 2990771, at *6 (N.C. Ct. App. June 18, 2013) (emphasizing <u>inter</u> <u>alia</u>, that a defendant is engaged in an activity "in or affecting commerce" where "[t]he underlying transactions . . . involve the buying, developing and selling of real estate.").

## CONCLUSION

Based on the foregoing, the defendant's motion to dismiss is **DENIED.**

**END OF DOCUMENT**